IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.   13-cv-01631-MJW

MICHAEL C. KLIPFEL,

Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

Defendant.

## OPINION AND ORDER

**MICHAEL J. WATANABE**
**United States Magistrate Judge**

The government determined that Michael Klipfel is not disabled within the meaning of 42 U.S.C. §423(d) and 42 U.S.C. §1382c(a)(3).  Klipfel has asked this Court either to reverse that decision or to remand for further hearing.

The Court has jurisdiction under 42 U.S.C. §405(g) and 42 U.S.C. §1383(c)(3).  Both parties have agreed to have this case decided by a U.S. Magistrate Judge under 28 U.S.C. §636(c).  The Court REMANDS the decision for further hearing.

### Factual Background

Klipfel is epileptic.  As a result, he suffers from seizures and migraines.  Both symptoms can occur without any trigger, but both can also be triggered by exposure to flashing lights, excessive heat, too much time in front of TV and computer screens, and other environmental stimuli.  Klipfel has had this condition since he was 10 or 12 years old (he is now around 31), and he goes to Pueblo Neurology for treatment.  The treatment consists of both medications and an implanted medical device known as a

2

Vagus Nerve Stimulator ("VNS"), which can be activated during seizures to help end or control them. The seizures (and the ensuing recovery period) tend to render Klipfel unable to work for a day or two. Similarly, the migraines tend to take Klipfel out of commission for the better part of a day. His ability to work depends on the frequency and intensity of these symptoms.

He also takes medication for anxiety and depression. There is some dispute as to whether he takes these medications regularly, and whether he needs to. As will be discussed below, however, there is no honest dispute that the anxiety and depression do not interfere with Klipfel's ability to function and to work.

Before October 2009, Klipfel had worked at various jobs, including fast food, retail sales, customer service, and bank telling. Although he says he suffered at least one seizure at each job, he also says that he left most of these jobs for reasons unrelated to his epilepsy. He stopped working at his most recent job (at a customer-service call center) on or about Friday, October 30, 2009. During his disability hearing, Klipfel gave conflicting testimony as to whether he left due to the events of the following week, or for other reasons unrelated to his epilepsy.

On or about Tuesday, October 3, 2009, Klipfel had a seizure while in the shower. He fell, hit his head, and was unconscious for several hours before waking up. He was then admitted to St. Mary-Corwin Medical Center—spending the first few days in the intensive care unit, and moving to the telemetry unit after his CT scans showed no signs of a stroke. In all, he stayed seven nights in the hospital. He has not worked since then (at least, not as of the end of evidence in this case, in mid-2011).

3

In January 2010, Klipfel applied for both Supplemental Security Income and Disability Insurance benefits, alleging that his seizures and migraines have worsened since the head injury sustained in the shower incident—to the point he can no longer work. Administrative Law Judge ("ALJ") Kim Nagle held the hearing in July 2011 and received into evidence a number of exhibits, including:

- Written statements by Klipfel, the notes of Social Security Administration employees, and with other administrative paperwork (AR 66–191);

- Medical records from Pueblo Neurology, where Klipfel's condition is treated by Nurse Practitioner Christine Miller under the auspices of neurologist Dr. Sumant Rawat (AR 270-88);

- Medical records from Pueblo Community Health Center, an indigent-care facility that Klipfel uses for general health needs and at which his primary care physician, Dr. David Krause, practices (AR 289–335);

- A "Consultative Examination Report" prepared by Brett Valette, Ph.D., a clinical psychologist (AR 346–51);

- A "Case Analysis" and a "Psychiatric Review Technique" prepared by Dr. Anthony Gottlieb, another medical consultant (AR 352–67);

- Further medical records from Pueblo Neurology, submitted to the ALJ ahead of the hearing but not reviewed by Happer, Valette, or Gottlieb, and including a letter from Nurse Miller opining on Klipfel's ability to work (AR 377–83);

- A questionnaire filled out by Nurse Miller (on behalf of Dr. Rawant) describing the frequency and intensity of Klipfel's symptoms (AR 384–86); and

- A questionnaire filled out by Dr. Krause describing the frequency and intensity of Klipfel's symptoms (AR 387–89).

At the hearing, Klipfel gave somewhat vague testimony about his epilepsy symptoms, and the ALJ did not press for more detail (AR 28–59). Klipfel gave no testimony at all about his mental-health issues, and the ALJ did not ask. Klipfel's attorney asked his client no questions at all.

The ALJ denied Klipfel's claim for benefits. As to Klipfel's epilepsy, she found that the impairments were "severe" as defined by law, but that he retained sufficient "residual functional capacity" to engage in certain types of work—including the types of work that he had engaged in prior to his shower incident. She rested this determination on a finding that Klipfel's seizures and headaches were not as frequent or intense as he alleged. As to Klipfel's anxiety and depression, she found that the conditions were not severe and that they did not impose any relevant limitation on his ability to work. Klipfel appealed, and supplied updated medical records to support that appeal, but the Social Security Administration's Appeals Council declined to review the ALJ's decision.

## **Analysis**

The Court reviews the ALJ's decision to determine whether the factual findings are supported by substantial evidence and whether the correct legal standards were applied. *See Pisciotta v. Astrue,* 500 F.3d 1074, 1075 (10th Cir. 2007). "Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." *Raymond v. Astrue*, 621 F.3d 1269, 1271–72 (10th Cir. 2009) (internal quotation marks omitted). The Court "should, indeed must, exercise common sense" and "cannot insist on technical perfection." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). The Court cannot reweigh the evidence or its credibility. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

Klipfel contends that the ALJ made two errors. First, he argues that the ALJ gave short shrift to his purported mental-health limitations and, relatedly, failed to

evaluate the weight to be given Dr. Valette's opinion on the question. Second, Klipfel argues that the ALJ should have found that his epilepsy symptoms were as frequent as he alleges and, relatedly, that the ALJ failed to give Dr. Krause the weight due a treating physician's opinion.

### I. **Klipfel's Purported Mental-Health Limitations**

Klipfel argues that the ALJ erred (1) by not finding his mental-health issues to be more severe, (2) by not discussing the weight due to Valette's psychological examination report in that regard, and (3) by not developing the record further as to these purported limitations.

As to the first argument, there is substantial evidence in the record to support the ALJ's findings. Klipfel himself provided information about his daily life, without noting any limitations attributable to depression or anxiety (AR 130–66). Indeed, he did not testify at all about mental-health limitations, even though he was represented by counsel and his attorney was given a chance to elicit the testimony (AR 29–58). Dr. Valette, the clinical psychologist, provided a report from which one could easily infer that Klipfel, though impaired to some degree, was not functionally limited by his depression and anxiety (AR 346–51). Dr. Gottlieb reviewed the medical records and Dr. Valette's evaluation and concluded that there was no indication of any substantial functional limitations (AR 353–67). The medical records are nearly uniform in describing Klipfel's depression and anxiety as mild or controlled, and there is no indication that any treating source thought Klipfel's mental health warranted additional treatment. In sum, substantial evidence supports the ALJ's determination on this point.

6

As to the second argument, an ALJ must discuss the appropriate weight to give each medical opinion in the record, 20 C.F.R. §404.1527(c)—but only if the opinion at issue is a "medical opinion" as defined by the applicable regulations. *See Welch v. Colvin*, ___ F. App'x ___, 2014 WL 1853905, at *1–2 (10th Cir. May 9, 2014); *Cowan v. Astrue*, 552 F.3d 1182, 1189 (10th Cir. 2008). As a result, the only medical opinions that an ALJ must explicitly assign weight to are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Valette's opinion described symptoms, arguably made some judgments about them, and arguably made a diagnosis; it did not include any judgments about what Klipfel could or could not do as a result of his mental health, and it did not include any judgments about Klipfel's restrictions. Accordingly, it was not a "medical opinion" that the ALJ was compelled to assign an explicit weight to. The ALJ was required to consider it along with the rest of the non-opinion evidence, and it is clear that she did so (*see* AR 15, 20).

As to Klipfel's final argument, the record was sufficiently developed to allow the ALJ to make a determination about Klipfel's mental-health limitations—for largely the same reasons given above to show that the ALJ's findings are supported by substantial evidence. *See, e.g.*, *Cowan v. Astrue*, 552 F.3d 1182, 1187 (10th Cir. 2008) (rejecting similar argument because the record contained evidence of claimant's "daily activities and physical abilities," a Psychiatric Review Technique form prepared by a medical

consultant, and no testimony concerning work limitations related to mental health despite an opportunity to have counsel for claimant elicit such testimony).

In sum, the ALJ's determinations as to Klipfel's mental-health limitations are supported by substantial evidence, and the ALJ applied the correct legal standards. Her determinations on this topic are affirmed.

**II.     The Frequency of Klipfel's Epileptic Symptoms**

Klipfel argues that the ALJ erred by not finding epilepsy symptoms to be as severe as he alleged. As a predicate matter, he argues that the ALJ should have given "controlling weight" to the opinion of Dr. Krause, as the "treating physician."

As to Dr. Krause's opinion, it is true that the ALJ must give controlling weight to a "treating physician" under certain conditions. 20 C.F.R. § 404.1527(c)(2). But Dr. Krause is not a treating physician. That term is defined in the regulations:

> *Treating source* means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice *for the type of treatment and/or evaluation required for your medical condition(s)*. We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source *if the nature and frequency of the treatment or evaluation is typical for your condition(s)*.

20 C.F.R. § 404-1502 (emphasis added). The regulation assumes that the "treatment relationship" relates to the condition at issue. So far as the record in this case reveals, Dr. Krause has never seen Klipfel for purposes of treating his epilepsy; he has seen

8

Klipfel only for other, unrelated conditions. He therefore does not have a "treatment relationship" with Klipfel with regard to his epilepsy and is not a treating physician for purposes of 20 C.F.R. § 404.1527(c)(2).

Even though Klipfel is wrong about the legal status of Dr. Krause's opinion, the ALJ's findings as to the frequency and severity of Klipfel's symptoms nonetheless lack substantial evidence. In discounting the credibility of the claimant and in discounting the weight attributable to both Dr. Krause and Nurse Miller's opinions, the ALJ relies heavily on findings that the record does not support. For example, the ALJ states:

> The record plainly shows that the claimant has not been compliant with his VNS treatment regimen. In March 2011, it was found that the claimant had not activated his VNS since October 2011. (Ex. 14 at 1.) The claimant also reported not being compliant with Keppra, one of his epilepsy medication, on the day of that visit. (*Id.*)

(AR 19.) Each of these factual findings mischaracterizes the evidence and lacks substantial evidence to support it.

First, it is true that the counter on Klipfel's VNS showed a total of 107 activations from August 10, 2010 and the same number on March 30, 2011—a period of about seven and a half months) (AR 377, 381). But it is also true that Nurse Miller tested the device on March 30, 2011 and found that the counter was broken (AR 377) ("I did have him repeat using his magnet and he said he felt it work and I could hear it change in his speech. When [I] re-interrogated his VNS, it did not show that the magnet had been used."). In fact, in August 2011, Klipfel underwent an operation to have the device's battery replaced (AR 437). The battery-replacement surgery happened after the ALJ rendered her opinion and she obviously was not aware of it—but the replacement

surgery is in the record presented to the Appeals Council, and it is therefore part of the record in this case. *Blea v. Barnhart*, 466 F.3d 903, 908 (10th Cir. 2006). Further, before the counter stopped working, the information it provided tends to support Klipfel's claims. It showed 5 activations between March 24 and September 28, 2009, suggesting a use of just less than once a month prior to the shower incident (AR 310, 311)—and by contrast, 17 activations between January 27 and August 10, 2010, an increase to more than twice a month (AR 312, 381).

Second, although Klipfel did state that he forgot to take his Keppra medication on the morning he had blood work done, those tests showed *some* Keppra in his system (AR 377), and other tests on other dates also showed Keppra in his system (AR 312). The ALJ also points to a statement he made to Nurse Miller that he had stopped most of his medications and felt better as a result—but that notation doesn't establish *which* medications Klipfel had stopped taking. The document, from June 2010, lists his two epilepsy medications as "current medications," while failing to list the several other medications that show up on most other reports (*e.g.*, AR 312 (listing nine medications)). The natural inference would be that he stopped taking the medications *not* listed—the ones he takes for anxiety, depression, insomnia, restless leg syndrome, etc. To look at these records and conclude that Klipfel was not taking his epilepsy medication regularly is to draw an inference for which there is inadequate support in the record.

These two fact findings have no more than a scintilla of evidence to support them. The ALJ mentions the apparent lack of use of the VNS three times in her opinion:

10

to discount Klipfel's testimony, to discount Klipfel's statements to providers in his more recent neurology records, and to discount Nurse Miller's opinion (AR 19, 20, 21). The ALJ also relies three times on the flawed inference that Klipfel does not take his epilepsy medication (*Id.*). The medical records in this case almost uniformly support a finding that, following the shower incident, Klipfel's epileptic symptoms increased in frequency and severity. The ALJ may discount those records if she has good reason for doing so. She may also find that the symptoms have increased to some degree, but not as much as alleged. But the ALJ must base that decision on fact findings that are supported by substantial evidence—and she did not do so here.

## **Conclusion**

For the reasons set forth above, the Commissioner's decision is REMANDED to the Commissioner for further hearing.

Dated this 19th day of September, 2014.

BY THE COURT:

/s/ Michael J. Watanabe
MICHAEL J. WATANABE
United States Magistrate Judge